IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENTERED
03/09/2010

| | | |
|---|---|---|
| IN RE: | § | |
| RICHARD WHITE, | § | Case No. 09-35259 |
| Debtor(s). | § | |
| | § | Chapter 11 |
| | § | |
| FOUR SEASONS EQUIPMENT, INC., *et al*, | § | |
| Plaintiff(s) | § | |
| | § | |
| VS. | § | Adversary No. 09-03352 |
| | § | |
| RICHARD WHITE, *et al*, | § | |
| Defendant(s). | § | Judge Isgur |

## MEMORANDUM OPINION

For the reasons set forth below, the Court holds that:

1.     Four Seasons Equipment, Inc. ("Four Seasons") did not properly exercise its right to purchase Richard White's ("White") shares.  Consequently, White remains an 8% shareholder in Four Seasons.

2.     White was an at-will employee of Four Seasons who was legally terminated.  The termination was not for any improper purpose.

3.     George S. Nevins ("Nevins") improperly received interest free loans from Four Seasons and must compensate Four Seasons for its loss on the loans.

4.     Four Seasons' transactions with Nevins' affiliates caused no damage to Four Seasons.

5.     White owes $14,000.00 to plaintiffs on account of loans made to him.

6.     Four Seasons disguised the dividends it paid to employee-shareholders by referring to the disguised dividends as "bonus" payments.  White was excluded from those distributions and is entitled to damages caused by the payment of the disguised dividends.

7.     Four Seasons must either (i) pay White future dividends; or (ii) buy-out White's 8% interest.

### This Adversary Proceeding

Four Seasons and Nevins are suing White and his wife, Vicki White, for default on two

promissory notes.  Plaintiffs allege that the Whites owe Four Seasons $4,000, and Nevins and his wife, Shirley Nevins, $10,000 on the notes.  Plaintiffs are also suing White for breach of Four Seasons' shareholders' agreement.

The Whites counterclaim for wrongful termination, breach of contract, and fraud.  They allege that following Four Seasons' termination of White's employment, (i) Four Seasons failed to exercise its rights under a buyout option contained in the shareholders' agreement; and (ii) Four Seasons paid large bonuses to the remaining employee-shareholders, but no equivalent dividend to White.  White argues that the large bonuses were disguised dividends.  Thus, as an 8% shareholder, White claims that he was entitled to an 8% share of the bonus payments.  The Whites also claim that Nevins defrauded Four Seasons by making loans to himself and by diverting business opportunities to entities that Nevins partially or wholly owned.  These entities are named as third party defendants.

This lawsuit was originally filed in state court.  It was removed to this Court after White filed for bankruptcy.  The Court conducted a three day trial from December 1, 2009 to December 4, 2009.

## Jurisdiction, Venue and Authority

This matter is related to White's chapter 11 bankruptcy case.  Accordingly, this Court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1334.  Venue is proper pursuant to 28 U.S.C. § 1409.  The parties have consented to the entry of a final judgment by this Court.  28 U.S.C. § 157.

## Background

Four Seasons owns, leases and sells heavy construction equipment, such as cranes and excavators.  White, Nevins and many of the others involved with Four Seasons met when Nevins was the principal of ComEquip, another heavy construction equipment company.  ComEquip

was subsequently sold and Nevins received a large amount of cash from the sale.  Following the sale, Nevins was bound by a non-competition agreement.

As the term of the non-competition agreement drew to a close, Nevins was approached by Dave Keim.  Mr. Keim had decided to form Four Seasons and asked Nevins to join the organization.  Four Seasons was initially capitalized with minor equity infusions from its owners and with a $1,000,000 loan from a company owned by Nevins' family members.  Four Seasons was formally incorporated in 2001.

White had worked for Nevins and Keim at ComEquip.  When Four Seasons was formed, White was asked to join the company as an employee and minority shareholder.   White purchased 8% of the shares of Four Seasons and was employed by Four Seasons as a salesman.

Four Seasons and all of the employee-shareholders contemplated that the employee-shareholders would work for a below market salary and receive bonuses to bring their compensation to market.  Although not documented in the corporate records, the amount of each shareholder-employee's bonus was to be established in proportion to the shareholder-employee's ownership interest in the company.  Nevins' bonus would be measured by the proportionate ownership of his family entities.

**Analysis**

There are many disputed issues of fact.  Accordingly, the Court makes its fact findings along with its analysis.

**1.     White's Claim for Wrongful Termination**

"The long-standing rule in Texas provides for employment at will, terminable at any time by either party, with or without cause, absent an express agreement to the contrary."  *Fed. Exp. Corp. v. Dutschmann,* 846 S.W.2d 282, 283 (Tex. 1993).   Under the at-will employment doctrine, an employer may generally terminate an at-will employee without fear of legal

repercussions for a good reason, a bad reason, or no reason at all. *Exxon Mobil Corp. v. Hines,* 252 S.W.3d 496, 502 (Tex. App.—Houston [14 Dist.] 2008, pet. denied). However, the termination may not otherwise be wrongful, such as being based upon retaliation against an employee for the filing of a harassment charge. *Dutschmann,* 846 S.W.2d at 283.

A.      The "Spiff" Issue

Most of White's work was to rent equipment to Four Seasons' customers. Occasionally, White would engage in an equipment sale. In those instances, White could qualify for the payment of a "spiff"[1] by the manufacturer.

White's direct supervisor at Four Seasons was Mitch Nevins, Nevins' son. Towards the end of 2004, there was an equipment sale to one of Four Seasons' valued customers, Leecon. White was the individual responsible for leasing equipment to Leecon. However, Mitch Nevins was responsible for the company's long-term relationship with Leecon.

When a $3,000 spiff was due from the manufacturer, the spiff was paid to Mitch Nevins rather than to White. White believed that Mitch Nevins had stolen his $3,000 spiff and complained to Nevins. Nevins met with White and told him to try to work it out with Mitch Nevins. White never met with Mitch Nevins regarding the spiff.

The Court concludes that the "spiff issue" was very troubling to White. White was facing personal financial pressures and the loss of $3,000 was significant to him. Rather than handling the issue in a professional matter, such as meeting with Mitch Nevins or taking the issue before the board, White made derogatory comments about the company and its management to other employees. Although the exact words used by White are disputed, he implied that the Nevins family was dishonest and that Four Seasons was not being operated in an honorable manner.

---

[1] "Spiff" is slang for a bonus typically paid to a commission salesperson directly by a manufacturer. *See* Dictionary.com, http://www.dictionary.reference.com/browse/spiff (last visited Feb. 24, 2010). Dictionary.com.

White's exact choice of words does not matter.  In the vernacular, White was "bad mouthing" the Nevins family and Four Seasons' management.  As a result of this conduct, White was terminated.

### B.      White's Performance

Although there was conflicting evidence presented, the Court concludes that between 2001 and 2004, White was an above average salesman.  By 2005, his performance had waned substantially and he was performing at below average levels.  The Court recognizes that sales performance can vary over time.  The Court does not believe that White's diminished performance in 2005 gave rise to concerns by Four Seasons that ultimately led to his termination.

### C.      White's Theories

The Court notes that White believes his termination was for other reasons.  White conjectures that Nevins wanted to force him out of the business in order to hide various loans that Nevins had taken (described in more detail below), and otherwise to terminate White for impermissible reasons.  This belief is not supported by the evidentiary record and the Court concludes that it is mere speculation.

White was unable to prove that anyone at the company was trying to force him out or that there was any attempt to cover up any activity.  White did show that the loans to Nevins had not been authorized, but the loans had been fully repaid by the time the dispute with White arose.  There is no evidence indicating that White's knowledge of the loans played a role in White's termination.

There were other similarly situated employee-shareholders.  One of them asked for his shares to be purchased and was satisfied with the purchase price.  All of the others remained with the company and shared in large profits distributions.  No other reason (speculative or otherwise) was given as to why White was forced out of the company.  White was not situated differently

than the employees who remained with Four Seasons.  Given that other employee-shareholders were not "forced out" of the Company, the Court finds that the motive for White's termination was not driven by any attempt to rid Four Seasons of minority shareholders.

### D.    The Court's Conclusion

There is no dispute that White was an at-will employee.  The Court concludes that White was terminated because he disrupted the working environment by disparaging Four Seasons, its owners, and management.  Such a termination is permissible under Texas at-will employment law. *See Dutschmann* at 283.  Further, there is insufficient evidence in the record to find that White was entitled to the spiff.  To the extent that he seeks a judgment for the $3,000, White has failed to meet his burden of proof and relief is denied.

### 2.    White's Claim that the Bonuses were Disguised Dividends

### A.    The Company's Non-Dividend Policy Despite its Success

Prior to White's termination, Four Seasons did not pay any significant bonuses.  This was consistent with the original understanding between Four Seasons and its employee-shareholders. The early years of Four Seasons' existence were intended to be building years.  The company's focus was upon accumulating capital in order to finance the acquisition of equipment to serve as the company's inventory.

Each year during this period, the board would adopt a resolution authorizing Four Seasons to pay employee bonuses out of 10% of sales, the specific amount to be determined at the discretion of the board, subject to available cash.  Although these resolutions were regularly adopted by the board, no material bonuses were awarded prior to White's termination.

The company became very successful.  The following chart summarizes operating profits, total assets and total equity:

|  | Operating Profit | Total Assets | Total Equity |
|---|---|---|---|
| July 31, 2001[2] | n/a | $7,034,023 | $782,916 |
| June 30, 2002 | $1,752,603 | $27,745,253 | $3,427,451 |
| June 30, 2003 | $2,432,229 | $35,905,100 | $3,227,680 |
| June 30, 2004 | $1,576,213 | $33,730,611 | $3,543,448 |
| June 30, 2005 | $3,696,262 | $36,908,156 | $4,953,713 |
| June 30, 2006 | $3,804,949 | $44,896.941 | $6,434,156 |
| June 30, 2007 | $2,504,488 | $37,934,849 | $7,008,358 |
| June 30, 2008 | $4,122,421 | $53,103,455 | $8,351,733 |
| June 30, 2009 | $3,393,896 | $44,416,965 | $10,062,107 |

Despite its outstanding performance, Four Seasons never declared any dividends. Instead, beginning in 2006, Four Seasons attempted to avoid the double taxation of corporate profits by paying profits out as bonuses to the employee-shareholders, who were insiders.

### B.    Bonuses were Paid as a Tax Avoidance Measure

The concept of double taxation is straightforward.  If a bonus is paid, Four Seasons may deduct the bonus as a business expense.  The recipient of the bonus will pay tax at his regular marginal income tax rate.  If a bonus is not paid and the same funds are distributed as a dividend, Four Seasons will pay its federal tax on the profits (having received no deduction for the payment) and the recipient of the dividend will pay tax upon its receipt.

The following chart exemplifies the issue:

|  | Bonus Arrangement | Dividend Arrangement |
|---|---|---|
| **Hypothetical   Corporate   Taxable Income Before Payments of Bonuses or Dividends** | $1,000,000 | $1,000,000 |
| **Payment of Employee Bonuses** | $600,000 | $0 |
| **Corporation Taxable Income** | $400,000 | $1,000,000 |
| **Payment of Dividend** | $0 | $600,000 |
| **Receipt of Funds by Employees** | $600,000 | $600,000 |
| **Tax to Corporation (assumed at 34%)** | $136,000 | $340,000 |
| **Tax to Individual (assumed at 35%)** | $210,000 | $210,000 |
| **Total Taxes Paid** | $346,000 | $550,000 |

---

[2]   The record does not include financial statements for each month.  The company has a June 30 fiscal year. Accordingly, the Court has taken available data each year from the date closest to June 30.

In the foregoing example, the United States collects an additional $204,000 in taxes under the dividend arrangement than under the bonus arrangement.  This additional $204,000 is equal to the corporation's marginal income tax rate (presumed at 34%) multiplied by the difference in corporate income ($600,000), i.e. the included divided amount.  The additional $204,000 tax burden is borne by the corporation.  Accordingly, the corporation would prefer to characterize distributions as bonuses rather than as dividends.

Compliance with federal tax law aside[3], the example set forth above can also be used to illustrate why the diversion of dividends into bonuses would work to the disadvantage of a non-employee-shareholder, a person who would have no basis for a bonus payment.

After his termination as an employee, White was no longer eligible for bonuses.  Still, White continued to own 8% of the company.  Under the bonus example set forth above, White would receive nothing in cash.  However, the corporation would "save" a total of $204,000 in taxes by claiming the tax deduction for the bonuses.  White's 8% interest in the corporation would be undiminished because there would be no tax payment.

Conversely, if dividends were paid, White would receive 8% of the $600,000 (i.e. $48,000), upon which he would owe personal federal income taxes.  However, the corporation would pay $16,230 in taxes because of the absence of the tax deduction for the bonuses (i.e. Whites 8% proportional share of the corporation's $204,000 in taxes).  Therefore, White's position would be enhanced by $48,000 in dividends, but his 8% interest in the corporation

---

[3]   The Court notes that a corporation may not mischaracterize a dividend as a bonus without running afoul of federal tax laws. The Court will not examine tax law issues in this opinion.  However, the Court notes that (i) Four Seasons has a duty to comply with federal tax law; and (ii) it may be economically disadvantageous to claim an illegitimate deduction, despite the apparent short-term benefits associated with the potentially illegitimate deductions.  For, if the deduction is not allowed, the hypothetical corporation set forth above would owe the $204,000 in taxes and might owe additional penalties and interest.  *See Brewer Quality Homes, Inc. v. Comm'r.,* 122 Fed. Appx. 88, (5th Cir. 2004); *Owensby & Kritikos, Inc. v. Comm'r.,* 819 F.2d 1315 (5th Cir. 1987).

would be diminished by $16,230.

Accordingly, White would be better off under the dividend scheme than under the bonus scheme.  Under the bonus scheme, White would receive $0 in distributions, but his 8% interest would not be diminished by any tax payments.  Under the dividend scheme, White would be entitled to $48,000 in dividends, but his 8% interest in the corporation would be diminished by $16,320 (i.e. 8% of the corporation's payment of $204,000 in taxes).  He would receive a net value of $31,680 under the dividend scheme.  Therefore, overall, White would be better off under the hypothetical dividend scheme by $31,680.

### C.      The Bonuses Were Disguised Dividends

With that background, the Court will analyze the payment of executive bonuses by Four Seasons.  Plaintiffs' Exhibit 62 reflects all bonuses paid in 2006 and 2007.  The following bonuses were paid to employee-shareholders or Nevins:

| | Oct. 2006 | | May, 2007 | | June, 2007 | | Nov., 2007 | |
|---|---|---|---|---|---|---|---|---|
| **Dundas** | $96,000 | 12.00% | $132,000 | 12.00% | $120,000 | 12.00% | $240,000 | 12.00% |
| **Emr** | $40,000 | 5.00% | $55,000 | 5.00% | $50,000 | 5.00% | $100,000 | 5.00% |
| **Keim** | $80,000 | 10.00% | $110,000 | 10.00% | $100,000 | 10.00% | $200,000 | 10.00% |
| **Nevins** | $504,000 | 63.00% | $693,000 | 63.00% | $630,000 | 63.00% | $1,260,000 | 63.00% |
| **Dubord** | $80,000 | 10.00% | $110,000 | 10.00% | 100,000 | 10.00% | $200,000 | 10.00% |
| | | | | | | | | |
| **TOTALS** | $800,000 | 100.00% | $1,100,000 | 100.00% | $1,000,000 | 100.00% | $2,000,000 | 100.00% |

The total bonuses that were given are as follows:

| | Total Bonuses | Percentage |
|---|---|---|
| **Dundas** | $588,000 | 12.00% |
| **Emr** | $245,000 | 5.00% |
| **Keim** | $490,000 | 10.00% |
| **Nevins** | $3,087,000 | 63.00% |
| **Dubord** | $490,000 | 10.00% |
| | | |
| **TOTAL** | $4,900,000.00 | 100.00% |

The ownership of the company by shares and percentages were as follows:

|  | Shares Owned | Percentages |
|---|---|---|
| Dundas | 840 | 12.00% |
| Emr | 350 | 5.00% |
| Keim | 700 | 10.00% |
| Nevins[4] | 3,850 | 55.00% |
| Dubord | 700 | 10.00% |
| White | 560 | 8.00% |
|  |  |  |
| TOTAL | 7,000 | 100.00% |

Thus, with the exceptions of White and Nevins, bonuses were always paid according to each employee-shareholders' proportionate share in ownership. For the purposes of distributions, Four Seasons assumed (incorrectly, as set forth below) that Nevins had acquired White's shares. On that incorrect assumption, bonuses to shareholder-employees were paid out in exactly the same proportion as share ownership.

Remarkably, the uncontroverted testimony at trial was that such a proportionate distribution was the intent of the board. The proportionate distribution would allow the shareholder-employees to share in the firm's profitability, avoid double taxation, and pay nothing to White.

Moreover, the amount of the bonus was determined based on the corporation's earnings. The amount was set to provide a deduction from earnings. These amounts constitute "disguised dividends." The Fifth Circuit has instructed this Court on how to recognize a disguised dividend:

> Substantial bonuses declared at the end of the year when the earnings of a business are known usually indicate the existence of disguised dividends. Moreover, this Court has previously determined that, especially in the context of closely held corporations, "it is in the tax interest of all parties to characterize the amounts distributed to shareholders/officers as compensation rather than dividends." Because the "[d]istribution of

---

[4]   The Court attributes the 3,850 shares owned by an entity held by Nevins' family, Circle N, to Nevins for the purpose of determining whether bonuses were paid proportionately to ownership shares.

> profits through compensation payments to shareholder/officers avoids the double tax on corporate profits which are distributed to shareholders as dividends," the concern arises where corporations distribute their profits through the payment of unreasonably large salaries and bonuses to those controlling shareholder/officers. Therefore, it is necessary to "carefully scrutinize the payments to ensure that they are not disguised dividends."

*Brewer Quality Homes,* 122 Fed. Appx. at 94-95. *See also Owensby & Kritikos, Inc.,* 819 F.2d at 1329.

This Court sees no reason why the same "careful scrutiny" should not be applied to an allegedly disguised dividend when the complaining party is a disenfranchised shareholder rather than the Commissioner of Internal Revenue.

The Court concludes that the payments were disguised dividends and that White was entitled to his proportionate share.[5]  The Court examines the various defenses offered by Four Seasons to rebut the Court's conclusion.

First, there were some bonuses paid to non-shareholder employees.  Although most of these bonuses were of nominal amounts, both Mitch Nevins and Butch Carpenter, the company's chief financial officer, received significant bonuses.  The Court finds that the non-shareholder bonuses do not explain why the shareholder-employee bonuses were consistently paid in proportion with each shareholder-employee's ownership share.  Perhaps more importantly, the non-shareholder bonuses do not overcome the uncontroverted testimony that Four Seasons paid shareholder-employee bonuses in order to avoid the double taxation of dividends.  Thus, the only aid that the non-shareholder bonuses provide to Four Seasons is that, as discussed below, they may guide the Court's determination as to whether at least a portion of the disguised dividends should be treated as legitimate bonuses.

---

[5] However, as set forth below, this conclusion, which appears obvious upon an initial review of the facts, is less apparent upon further review.  Nevertheless, the Court finds that the bonus payments were, in substance, disguised dividends.

Second, Four Seasons argues that the under-compensation[6] of the shareholder-employees supports the conclusion that the bonuses were not disguised dividends.  There are two principal problems with this argument.  First, White was also underpaid when he was with Four Seasons. Like the other shareholder-employees, he was underpaid with the expectation that he would share in bonuses.  Yet, Four Seasons denied him the benefit of that bargain.  It would be wholly inequitable to deny White his fair dividend on the theory that others should be fairly compensated, but not him.  Second, the decision to pay the bonuses was made by the shareholder-employees who participated in the board decision to pay the bonuses.  The Court will not give deference to the board's business judgment when every board member was financially conflicted on the decision.  The board members who made the decision each got bonuses; White, who was no longer a board member, did not.  The manner in which the board member-shareholder-employees chose to receive their compensation was in the form of bonuses that were proportional to their ownership interest based on the company's profits, i.e. performance—not based on their own individual work performances.  Furthermore, the intent behind the bonus scheme was to avoid the payment of federal corporate income taxes.  The Court sees little equity in Plaintiffs' favor.

Third, Four Seasons claims that it only intended to provide incentives to employees, and White was no longer an employee at the time the bonuses were awarded.  This argument has no traction.  It confuses the necessity of rewarding employees based on their personal work performances with the necessity of rewarding shareholders for the company's performance. White was entitled to share in the compensation paid to shareholders.

---

[6] The facts presented at trial indicate that the shareholder-employees were paid substantially lower salaries than the salaries paid to comparable employees at other heavy construction equipment companies.

D.     White's Damages

As set forth above, the Court has concluded that White was not paid the dividends to which he was entitled.  White owns 8% of the shares of Four Seasons and argues that he should receive a dividend from Four Seasons that is equal to 8% of the total bonuses given to the shareholder-employees.

The Court disagrees.  As a shareholder, White cannot complain about the payment of legitimate bonuses; he can complain that he was damaged by the failure to pay him the dividend to which he was entitled.  If the payments made to the employee-shareholders were truly bonuses, then White should get nothing on account of this claim.  He was not an employee and had no entitlement to bonuses.  However, if the bonuses should have been characterized as dividends; as such, Four Seasons would have been required to pay corporate taxes on its earnings.  Although the Court has utilized the federal income tax rate in its hypothetical examples set forth above, the testimony is uncontroverted that Four Season's actual tax savings (including all tax obligations and not just the marginal federal corporate income tax rate) is equal to 40% of the amount paid.  The fact that the other employee-shareholders received their funds without consideration of the tax burden on the corporation cannot entitle White to receive more than he would have received if the distributions were properly characterized as dividends.

The total disguised dividends were $4,900,000.  If the company had paid its tax burden, then the total actual dividends would have been $2,940,000 (i.e., 60% of the $4,900,000).  White, as an 8% shareholder, should have received 8% of the $2,940,000 dividend pool, which comes to $235,200.  Accordingly, the Court holds that White is entitled to $235,200 in damages.

E.     Four Seasons Failed to Purchase White's Shares

The analysis regarding the disguised dividends would not have been necessary if Four Seasons had exercised its right to purchase White's shares in accordance with the shareholders'

agreement.

Each of the shareholders executed the shareholders' agreement.  Although there is no date on the shareholders' agreement (see Defendant's Exhibit 77), it was executed at about the time of Four Seasons' inception.  It is worth mentioning that instead of hiring an attorney to draft a shareholders' agreement specifically designed for Four Seasons, Nevins simply contacted an attorney and requested a copy of a draft boilerplate agreement from the attorney's word processor.  After receiving the draft, Nevins had each shareholder and each shareholder's spouse sign the agreement.

Although not drafted to suit Four Seasons, the executed agreement is an integrated and cogent document.  It is easy to understand what it means, even if it is difficult to comprehend why certain provisions are present.  No party challenges the enforceability of the document and the Court will enforce the document as it is written.

Article V reads, in its entirety, as follows:

> If a Shareholder terminates his relationship as an employee of the Company or is terminated for any reason other than death, disability or retirement, then the Company shall have the option to purchase all of the stock of the Company owned by such Shareholder.  Such option must be exercised within ninety (90) days after written notice of the termination of the employment of such Shareholder is given or received by the Company.

Article 7.3 reads, in its entirety, as follows:

> Any option to purchase stock hereunder shall be deemed exercised at the time the purchasing party actually delivers to the selling party written notice of intent to exercise such option along with a certified or cashier's check in the amount of the initial payment of the purchase price required to be paid pursuant to this Agreement, if any, or deposits same in the U.S. mail (registered, return receipt requested) properly stamped and addressed to the last known address of the selling party.

It is undisputed that Four Seasons never delivered any form of payment to White.

The valuation method for calculating the purchase price is set forth in Article 8.1 of the shareholders' agreement.  Article 8.1 reads, in its entirety, as follows:

> The total value of the Company for the purposes of this Agreement shall be determined by the Total Fixed Asset Value, less Total Long Term Liabilities, as of the most recent month end Balance Sheet.  [As an example, if the Total Fixed Asset Value is $18,000,000, and Long Term Liabilities are $17,000,000, the total stock value would be $1,000,000].  Based on this example, 10% of the Company stock would be worth $100,000.  The value of each share of stock shall be determined by dividing such total stock value by the number of shares of stock outstanding at the time of the valuation.

It is undisputed that Four Seasons never offered a fixed price for White's shares equal to 8% of the total stock value based on the most recent month end Balance Sheet.  Instead, Four Seasons offered a provisional payment to White and a "true up" arrangement that would be based on an audit arrangement proposed by the company.  The proposed "true up" arrangement was fair and would have been a reasonable provision to include in the original agreement.  But, the original shareholders' agreement was also fair and had no such "true up" arrangement.  The agreement signed by the parties required payment based on the most recent month end Balance Sheet, with payments commencing within 90 days of the termination date.  At no time did Four Seasons make such an offer or tender funds based on any offer at all.

Four Seasons' rights to purchase White's shares constituted an option in favor of Four Seasons.  Texas strictly construes option rights.  *Mensa-Wilmot v. Smith Intern., Inc.,* --- S.W.3d ----, 2009 WL 3931252 (Tex. App.—Houston [1st Dist.] 2009, no writ).  If a party seeks to exercise an option, but proposes a change in the terms of the option, the party has not properly exercised the option. *Tex. State Optical, Inc. v. Wiggins,* 882 S.W.2d 8, 10-11 (Tex.App.—Houston [1st Dist.] 1994, no writ).

In this case, the exercise of the option failed when Four Seasons:  (i) failed to tender the purchase price within 90 days; and (ii) attempted to modify the terms of the option by introducing a "true up" feature not included in the original agreement.

Accordingly, the Court holds that White owns 8% of the shares of Four Seasons.

### F.     Four Seasons' Liability to be Set-off by White's Obligations on the Notes

White acknowledges that he owes a total of $14,000 to Four Seasons and Nevins.  Nevins has elected to treat the portion of the debt owed to him as a set-off by Four Seasons for amounts owed by Four Seasons to White.  White does not object.  Any amounts owed by Four Seasons to White will be set-off by $14,000.

### 3.     White's Fraud Claims

Nevins and Four Seasons have a complex relationship.   Much like a familial arrangement, Nevins often treats Four Seasons favorably.  At times, Nevins provided needed capital on favorable terms to Four Seasons.  He provided a beneficial lease arrangement to the company and entered into purchase and sales agreements on favorable terms.

There were a number of corporate transactions between Four Seasons and affiliates of Nevins.  With one notable exception, these affiliate transactions were profitable to Four Seasons. The notable exception concerned a $2,000,000 loan from Four Seasons to Nevins to pay a personal judgment against him.  The judgment pertained to a lawsuit filed against Nevins arising out of the ComEquip transaction.  The details are not relevant to this opinion.  Nevins promptly repaid the loans in full, but paid no interest on the loans.

Nevins was an officer and director of Four Seasons.  As such, he owed fiduciary duties to Four Seasons. *Loy v. Harter*, 128 S.W.3d 397, 407 (Tex. App.—Texarkana 2004, pet. denied) (citing *Gearhart Indus., Inc. v. Smith Int'l, Inc.*, 741 F.2d 707, 719 (5th Cir. 1984)) ("Three broad duties stem from the fiduciary status of corporate officers and directors; namely, the duties

of obedience, loyalty and due care."). The interest free loans were made at Nevins' direction, without board approval. Nevins' fiduciary duty of loyalty precluded Nevins from unilaterally accepting interest free loans from Four Seasons. *See Gearhart*, 741 F.2d at 719.

The loss to the company was minimal, an amount agreed in closing arguments to be approximately $4,900 to White for his pro rata amount of the loss. He is entitled to a judgment against Nevins for that amount.

**4.      White's Shareholder Oppression Claim**

The Court has carefully examined Texas law to determine whether the facts of this case are sufficient for a finding of shareholder oppression. Although the Court believes that the issue is close, the Court has concluded that shareholder oppression has been demonstrated.

The Texas case providing the most extensive analysis of shareholder oppression is *Davis*. *Davis v. Sheerin,* 754 S.W.2d 375 (Tex. App.—Houston [1st Dist.] 1988, writ denied). There is no set standard for determining whether shareholder oppression has occurred. *Id.* at 382. Rather, the Court must examine the facts as a whole and determine whether the corporation's conduct has deprived a minority shareholder of the shareholders' reasonable expectations as an equity holder of the corporation. *Id.* at 382-83. The corporation's conduct must not be protected by the business judgment rule. *Id.*

White's complaint is not one of general dissatisfaction with management; on the contrary, the corporation is well run. Instead, White's complaints deal with whether the corporation mistreated him in his capacity as a shareholder.

**A.      Equitable Relief is Appropriate**

The Texas Business Organizations Code informs the Court as to when the Court should impose equitable relief on behalf of a minority shareholder. The Code provides that a receiver should be appointed when "the actions of the governing persons of the entity are illegal,

oppressive or fraudulent." TEX. BUS. ORG. CODE. § 11.404(a)(1)(C). The same Code provides that the Court should appoint a receiver only if "all other available legal and equitable remedies . . . are inadequate." TEX. BUS. ORG. CODE. § 11.404(b)(3).

There is no controlling case law on the meaning of the phrase "illegal, oppressive or fraudulent." However, there was no evidence of any fraud in this case. The Court has concluded that the dividends were disguised dividends in derogation of federal tax law. In that sense, they were illegal.

Furthermore, the Court concludes that a corporation that operates in a manner intended to deprive a shareholder of its reasonable expectations to share in the corporation's profits has operated in an oppressive manner. *See Patton v. Nicholas,* 279 S.W.2d 848, 854 (Tex. 1955). The payment of $4,900,000 in disguised dividends—when White was paid nothing—was an extraordinary act by the corporation in derogation of White's rights as a shareholder. One of a shareholder's fundamental expectations is to share in the corporation's profits. *Id.* By diverting all of those profits for the benefit of the other shareholders (or the families that own them), the corporation obviously denied White his expectations as a shareholder of Four Seasons.

This conduct could be excused—and White would only be entitled to past damages—if it were unlikely to continue in the future. Because the corporation might have mistakenly believed that it had exercised its right to purchase White's shares, the Court must consider whether the Court's declaration that White is a shareholder and the award of actual damages for past conduct is sufficient to protect White's future expectations.

Three major facts force the Court to conclude that White is entitled to some form of equitable relief to protect his future expectations.

First, at trial, the corporation did not limit its defense of the disguised dividends to its belief that White was no longer a shareholder. Instead, the corporation defended the disguised

dividends for at least two other major reasons.  The first of these, explained in more detail above, was that the use of the disguised dividend technique protected the dividends from double taxation.  That issue has not changed.  The second alternative reason given by the corporation was that it was important that the profits of the corporation be paid to current employees.  Since White had been terminated, the corporation believed that White should no longer receive any share of the corporation's substantial profits.  That situation also does not change with the issuance of this opinion.

These conclusions are exacerbated by the absence of the declaration of any dividends by the corporation.  If some reasonable judgment had been applied to divide the distributions into bonuses for jobs well done and dividends for profits earned, the Court might have been persuaded as to the bona fides of these corporate decisions.  Left with a dividend-less corporation and no expectation of future dividends, the Court finds that it must fashion equitable relief.

Second, the Court notes Nevins' personal use of corporate assets.  The corporation was constantly starved for capital.  Capital drove profits.  At a time of great capital needs, Nevins diverted $2,000,000 (albeit temporarily) to his personal use.  The only measure of damages proven was the interest cost of the money.  But, the opportunity costs associated with this activity serves to convince the Court that the corporation is not being operated for the benefit of all shareholders.

Third, the corporation paid the disguised dividends and then imposed a capital call on all shareholders.  White had originally paid $56,000 for his shares.  As a result of the capital call, White was forced either to pay an additional $56,000 or to be diluted by 50%.  Had the corporation really needed the capital, this would not have been problematic.  But, it makes no sense for the corporation to have paid $4,900,000 in disguised dividends and then to call capital from shareholders in a manner that would potentially dilute White with no foreseeable upside.

19 / 28

**B.      Form of Relief**

      **i.       White's Request for a Buy-Out**

White seeks a forced buy-out of his shares.  As an initial matter, the Court notes that no Texas statute explicitly allows for the forced buy-out of shares. *Davis,* 754 S.W.2d at 383.  *Davis* is the leading Texas case concluding that a forced buy-out of a minority shareholder is permitted in a Texas court of equity.

*Davis* was decided when the controlling statute was § 7.05 of the Texas Business Corporations Act.  *Id.*  Since *Davis*, Texas has substantially revised its statutory scheme.  The relevant statutory provisions are now contained in Chapter 11 of the Texas Business Organizations Code.  Although the two statutes have some similarities, there are also vast differences.  *Davis* held that because § 7.05 allowed the appointment of a liquidating receiver, a court in equity could always impose a less drastic remedy. *Id.* at 384.  Accordingly, the *Davis* court found that a buy-out was less onerous than a potential forced liquidation and was within the Court's equitable power. *Id.* at 383-84.

*Davis* is now largely codified, but with even more restrictive language. TEX. BUS. ORG. CODE § 11.404(b).  The Texas legislature has declared that a liquidating receivership should be imposed "only if . . . the court determines that all other available legal and equitable remedies, including the appointment of a receiver for specific property of the domestic entity under Section 11.402, are inadequate."  *Id.*

      **ii.      *Patton's* Prescription**

When considering what the legislature meant when it referred to "all other available legal and equitable remedies," this Court is guided by *Patton*. *Patton,* 279 S.W.2d at 848.  *Patton* preceded the adoption of the Texas Business Corporation Act; there were no statutorily defined remedies for shareholder oppression.  The Texas Supreme Court held that—as a Court of

equity—it should impose the least restrictive equitable alternative.  Although the plaintiff sought dissolution of the corporation, the Court awarded an injunction to assure that future dividends would be fairly paid to the oppressed shareholder. *Id.*

Accordingly, one of the equitable remedies that the Court must consider under § 11.402 is whether a *Patton*-type injunction should be issued.

### iii.    Imposition of the Least Restrictive Equitable Remedy by Election

In imposing the least restrictive equitable alternative, the Court has followed two principles:

- The relief must provide full relief to White; and

- The full relief should impose the smallest possible burden on Four Seasons.

Either of two forms of relief—each allowed under Texas law—would provide complete relief to White.  Because it is unclear which form of relief is the least onerous on the corporation, the Court requires Four Seasons to elect between the two possible remedies.

The first potential remedy is to require a buy-out of White's 8% interest in the corporation.  The second potential remedy is to impose a *Patton*-type injunction against the corporation.

### (a)    The Buy-Out Alternative

There are three alternative pricing methods available to the Court to determine the proper price at which the buy-out of White's shares should occur.

First, there is testimony by White's expert.  The expert's conclusions were discredited during cross examination.

Second, the Court could rely on book value, a measure that both experts testified was probably not appropriate.

Third, the Court could utilize the buy-out price and terms set forth in the shareholders' agreement.  For the reasons set forth below, this is the preferable alternative.

White's expert testified that the best method for determining the value of White's interest was by utilizing the income capitalization method.  He testified that the capitalization method should be applied to the company's EBITDA (earnings before interest, taxes, depreciation and amortization).  He found that the company's EBITDA was $9,000,000.  Based on several factors (including market conditions and a prior transaction involving ComEquip that had a 5.17 multiplier of EBITDA), the expert applied a six times multiple to the $9,000,000 and arrived at a value of $54 million for 100% of the company, debt free.  Debt was $32 million, leaving a $22 million shareholder value.  The expert further discounted the share value based on White's lack of control and the difficulty in marketing an 8% minority interest in a closely held corporation.  Having applied these discounts, the expert concluded that the fair value of the 8% interest was $1,234,880.

The cross examination of the expert was devastating.  The expert's analysis was based on projections.  He prepared a report in March that forecast annual revenue of $120 million.  Actual revenue was only $77 million.  Most importantly, the corporation's fiscal year ended in June.  Therefore, the expert's forecast was only for a 3 month period of time, yet his forecast erred by $43 million!  The Court will not credit the expert's conclusions.

The witness' credibility was discredited further when he testified that he had never been excluded from testifying as an expert.  The evidence reflected that he had previously been excluded in the Neftigas case.  Moreover, when he testified on his choice of earnings multiples, he gave completely different testimony in court from that given in his deposition.  The Court concludes that White's expert testified as to facts and conclusions that were convenient at the

time.  His testimony bore little relationship either to the truth or to his own opinions.  The Court will not credit his testimony in reaching any conclusions regarding fair value.

Four Season's expert gave no opinion as to value and limited his testimony to a critique of White's expert.

With respect to using book value to determine the fair value of the stock, the Court has little testimony to affirm the validity of the use of book value.  Although it could be used, no witness testified that it was valid to utilize the book value of the corporation on the particulars of this case.  Moreover, no witness testified as to how to apply White's 8% interest to the book value.  Would there be a discount for control or for marketability?  If so, how much?  With insufficient evidence to support the use of book value, the Court declines to apply it.

Although the Court will not apply a traditional book value measurement to value the company (i.e., total assets minus total liabilities equals shareholder value), the Court will examine the method chosen by the parties for valuing a minority interest.  This method is contained in the shareholders' agreement.  The shareholders' agreement binds the departing employee to sell his shares at a calculated price.  The company is not required to purchase at the calculated price.

That is the same mechanism that the Court has chosen to apply in issuing this judgment. The sales price is merely an option given to Four Seasons; if it elects not to exercise the option, it will be bound by the injunction described below.

The shareholders' agreement establishes the buy-out price and terms as follows:

- The company is valued at the difference between its Total Fixed Assets and Total Long Term Liabilities.[7]

---

[7]   The parties dispute whether the fixed asset calculation should be before or after depreciation.  The Court has carefully listened to the arguments.  Although there may be some vestige of ambiguity, the Court concludes that the calculation should be applied to the total assets, net of depreciation.

- The shares of stock are not discounted for marketability, control or any other reason.

- The company is allowed to repurchase the shares over a 25 month period, interest free.[8]

The Court acknowledges that the formula in the agreement could have substantial pitfalls. For example, if 100% of the company's assets were converted to cash and the company had no liabilities, the departing shareholder would be paid nothing for his shares.  Despite this, the formula may provide a discount for a company still in operation (it excludes both short term assets and short term liabilities), and does provide a lengthy period of time for purchase of the shares on an interest free basis.  Such a lengthy interest free period may recognize the discount for marketability and control.

In any event, the formula was agreed by the parties without coercion.  The Court sees little reason to substitute the Court's own judgment as to the fair terms of a buy-out.  The Court has applied the formula to the company's most recent balance sheet that was introduced into the record at trial.  The results are as follows:

| Total Fixed Assets | $53,988,136.73 |
| Less Depreciation | ($15,340,046.39) |
| Net Fixed Assets | $38,648,090.34 |
| Long Term Liabilities | ($29,406,568.11) |
| Total Value | $9,241,522.23 |
| 8% Value | $739,321.78 |

---

[8]   If the value of the purchased interest exceeds $1,500,000, a longer purchase period would apply.

Accordingly, if Four Seasons elects to purchase White's shares, it may do so by paying him $29,572.87 each month for 25 months.  The first monthly payment will be due on May 10, 2010.  The transfer of shares shall be effective upon White's receipt of the first payment and the balance of the payments shall be Four Season's unconditional obligation.

### (b)    The Injunction Alternative

If Four Seasons does not elect to buy-out White's shares, then White's interests can be appropriately protected by a permanent injunction.  The Court is guided by the Texas Supreme Court's decision in *Patton*.  *Patton,* 279 S.W.2d at 857-58.  It is helpful to examine the precise language used by the Court:

> The decree will include a mandatory injunction requiring the corporation and the petitioner as its dominant officer and stockholder to declare and pay at the earliest practical date a reasonable dividend on the stock of the corporation. This means that the amount of such dividend shall be substantial and shall take into consideration, as a strong factor in favor of greater size or amount, the amount of accumulated surplus of the corporation, the fact that the respondents have been wrongfully deprived of their dividends since the beginning, the more or less liquid or 'current asset' character of the large inventory of presumably salable merchandise, as well as such other matters as have logical bearing. The respondents are further entitled to have the injunction provide for reasonable dividends to be thereafter declared annually from future profits of the corporation and from accumulated surplus, provided only that the payment of such dividends be not clearly inconsistent with good business practice. Necessarily, the determination of the amount of the first dividend to be declared will be made in the trial court, as will also be the case with subsequent dividends in the event of contempt proceedings against the petitioner or the corporation or both for violation of the injunction, or proceedings for receivership and liquidation as hereinafter stated. Notwithstanding our reversal of the instant judgment of liquidation, the new decree shall, in addition to its injunctive provisions, provide for the court to retain continuing jurisdiction of the cause for a reasonable period, not to exceed five years, for the more adequate and convenient protection of the rights of the respondents, and with the express provision that should the petitioner or the corporation or both be adjudged to have violated the injunction, or if, upon the motion of the respondents, or either of them, and due hearing, it shall be determined that the corporation has been in any manner operated with bad faith toward the decree or toward the respondents or either of them in their position of minority stockholders,

the court shall without prejudice to its additional right to punish for contempt, forthwith appoint a receiver of the corporation, with instructions to liquidate it and distribute the net proceeds of said liquidation pro rata among the then shareholders.

*Id.*

Although *Patton* demonstrates that Texas law would allow for an injunction mandating the payment of reasonable dividends, this Court also finds that *Patton* stands for the proposition that such equitable relief should be tailor-made to the situation presented to the Court of equity. In these difficult economic times, the Court is loathe to mandate a particular dividend policy for the company. Moreover, the Court sees little reason to interfere with the successful business model utilized by Four Seasons. The Court's sole purpose in issuing the injunction is to protect White's future expectations that have thus far been frustrated by Four Seasons' conduct.

Accordingly, if the company does not elect to buy-out White's interest, then it will be permanently enjoined as follows:

1.      Except as set forth in paragraphs 2 and 3, Four Seasons may pay funds (whether as compensation, bonuses, commissions, loans, advances, dividends or otherwise) to its shareholders, any family member of any shareholder, or any affiliate of a shareholder only as follows:

An amount that is equal to the average compensation (exclusive of the disguised dividends described in this opinion and the commissions set forth below) paid to such person during the period July 1, 2006 through June 30, 2009, adjusted for the annual rate of inflation as reported by the United States Department of Labor Consumer Price Index; plus

Commissions, calculated on the same basis as was in effect on June 30, 2009.

2.      Four Seasons may pay any additional amount to its shareholders, any family member of any shareholder, or any affiliate of a shareholder, if such amount is pursuant to an

agreement approved in writing in advance by White and on such conditions as set forth in the agreement approved in writing by White.

3.      If Four Seasons pays any funds (whether as compensation, bonuses, commissions, loans, advances, dividends or otherwise) to its shareholders, any family member of any shareholder, or any affiliate of a shareholder in excess of the amounts set forth in paragraphs 1 or 2, then an amount equal to 8% of any such payment must simultaneously be paid to White, in cash.

4.      Four Seasons shall provide to White, not later than the last day of each calendar month, a report showing all payments made to its shareholders, any family member of any shareholder, or any affiliate of a shareholder during the preceding calendar month.

5.      If Four Seasons violates the terms of this injunction, White may sue to enforce the injunction in any court of competent jurisdiction and should be awarded all of his costs and attorneys fees expended in enforcement of the injunction.

Conclusion

1.      **Notice by Four Seasons**

The Court will defer issuing its final judgment until after Four Seasons has made its election.  The election shall be made by notice filed with the Court not later than April 1, 2010. If no timely election is made by April 1, 2010, then White may elect either of the two options by a notice filed not later than April 15, 2010.

Any election made pursuant to this memorandum opinion shall not estop or otherwise deprive a party from appealing the judgment to be issued by the Court.  The Court mandates the making of the election and allows the parties to retain their respective appellate rights.

Notwithstanding the foregoing, the Court notifies the parties that it intends to issue its judgment and that the judgment will be stayed only upon the issuance of a stay by this Court or

by the appellate court.  Accordingly, unless a stay is sought or obtained, the parties will be required to comply with the judgment pending appeal.

**2.**      **Legal Fees**

The Court will conduct an evidentiary hearing on legal fees.  The Court encourages stipulations prior to the hearing.  The hearing will be on March 17, 2010 at 9:00 a.m.

SIGNED **March 4, 2010.**

_____
Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE